ADELINE HASLETT

v.

AUGUST STEPHANY.

1. The owner of adjoining lots, the rear of which had no connection with any street, formed the plan, in selling them, of reserving an alleyway three feet wide across the rear of each lot, and opening on a public alley at one end

Haslett *v.* Stephany.

for the common use of the owners of the interior lots. The deed given a pur-
chaser of one of the interior lots, from whom complainant purchased, con-
tained a reservation of such way, but contained no grant of right of way over
the lots intervening between such lot and the alley, which were then owned
by the vendor, though such grant was intended.    Such deed was duly
recorded. All the lots were sold with the verbal understanding that the way
was to be reserved, but through oversight the reservation was omitted from
the deed given to the purchaser of the one adjoining the alley into which the
way opened.    The purchaser, in building, however, left a covered way up
to the second story, and it was used by complainant and the owners of the
other lots at the time such lot was purchased by defendant.—*Held,* that com-
plainant was entitled to have the deed of her grantor reformed, so as to con-
vey the right to use the way over defendant's lot, defendant being chargeable
with notice of such right by the record of the deed as written, and the use
made of the way when he purchased, of which he had actual knowledge.

2. The reformation of a deed is fairly within a prayer for general relief in
a bill in equity.

Heard on bill and affidavits, answer and affidavits, and agreed
state of facts as follows:

This cause was opened to the court on a motion for an injunc-
tion to stay an action at law, and then, upon an agreement of
the parties, it was turned into a final hearing upon the following
agreed facts: Complainant is the owner of a lot on the south
side of Atlantic avenue, in Atlantic City, twenty-five feet front
and rear, and eighty feet deep.    Defendant is the owner of a lot
of the same size, situate on the same side of Atlantic avenue,
twenty-five feet farther east, and abutting upon an alley called
the "Mansion House alley," twenty-five feet wide.    The loca-
tion of the lots is indicated upon the annexed plot.

Previous to March, 1879, two sisters named Lee were the
owners of a plot of land on the southeast corner of North Caro-
lina avenue and Atlantic avenue, on the east side of North
Carolina avenue and on the south side of Atlantic avenue, with
a frontage of one hundred and fifty feet on Atlantic avenue, and
a frontage of eighty feet on North Carolina avenue, and bounded
on its easterly end by the Mansion House alley.    Directly to
the east of this was the Mansion House, also owned by the
Misses Lee, and they also owned some or all of the land to the
south of the plot in question.    In that situation they divided

the plot into six lots, with a frontage of twenty-five feet each on Atlantic avenue and a depth of eighty feet. The lot nearest North Carolina avenue was conveyed in March, 1879, to one Kelly; the lot next east of it was conveyed in October, 1879, to one Caemmerer. The previous sale to Kelly left the lot sold to Caemmerer without any access to the street except through its front, and the Misses Lee devised the plan of reserving from the remaining four lots an alleyway three feet wide, from the rear of the Caemmerer lot and along the rear of the other lots to the Mansion House alley. In February, 1880, they sold to Lippincott, grantor of Mrs. Haslett, the fourth lot from North Carolina avenue, being also the third lot from the Mansion House alley, and in the conveyance thereof to Lippincott (recorded in February, 1880), they inserted this clause:

"Excepting and reserving, nevertheless, a strip of land on the rear or back of said lot, three feet wide, for the use and accommodation of the owners or occupants of the two lots adjoining on the east and the two lots adjoining on the west of the lot herein conveyed."

The lots referred to on the west are the Caemmerer lot and the lot subsequently conveyed to Galupo, and the lots on the east are the lot conveyed on September 30th, 1880, to one Applegate, and by him subsequently conveyed to the defendant, and the one between that and the Lippincott lot conveyed to one Harkins in June, 1881.

When, in June, 1881, the Misses Lee sold to Harkins, they inserted this clause in the conveyance, " and provided that three feet in width and twenty-five feet in length of said lot be kept open and used for the purpose of an alleyway."

When the Misses Lee conveyed to Applegate and Galupo, they agreed verbally with the grantees that an alleyway three feet in width should be kept open on the rear of their lots from the southeasterly corner of the Caemmerer lot to Mansion House alley, but they failed, through oversight, to insert in the deeds to Applegate and Galupo a reservation of that right. Mr. Applegate, however, recognized it, and, in building upon his lot, erected a building seventy-seven feet deep only from Atlantic

Haslett *v* Stephany.

avenue on the ground floor, leaving an alleyway of three feet wide the whole width of his lot, but he erected the other stories of his building the full depth. He subsequently conveyed to the defendant, Stephany. This alleyway was used by the owners of the four lots—Caemmerer, Galupo, Haslett and Harkins—up to some time in the present year, when the defendant, Stephany, who had in the meantime acquired title from Applegate, erected a gate across the alley on the southwest corner of his lot, which gate was broken down by the orders of Mrs. Haslett and Mr. Caemmerer, whereupon Mr. Stephany brought an action of trespass against Mrs. Haslett, to recover of her damages for breaking his close and for demolishing his personal property, the said gate, and this bill is filed to enjoin that suit. Mr. Stephany occupied offices in the building on the Applegate lot for some time before he acquired title, and had full notice that the owners of the lots to the west were using this alleyway, but had not notice of the verbal arrangement made between the Misses Lee and his grantor, Applegate. The deed from the Misses Lee to Lippincott was recorded prior to the conveyance by them to Applegate, and the deed from the Misses Lee to Harkins was recorded subsequent to the conveyance by them to Applegate.

The plan annexed to the foregoing shows that the four lots, including complainant's, between Kelly's, on the west, and defendant's, on the east, have all been built upon to their whole width, leaving no passageway from their several rears to the street, but upon each has been left sufficient space for a three-foot alley along the rear.

At the argument counsel agreed that the affidavits annexed to the bill and answer respectively should be used in evidence, so far as their contents were relevant and competent, as supplements to the agreed state of the case.

One of the Misses Lee swears in her affidavit that all of the several sales and conveyances of the five lots in question were made with the understanding with the several grantees that the alleyway in question should be kept open for their mutual benefit, and Caemmerer, whose deed pre-dates that to Lippincott, under whom complainant claims, swears to the same effect.

The date when complainant's house was built is not expressly stated, but she states in her sworn bill that since 1880 she has used the alleyway, from the rear of her lot to Mansion House alley, "for the delivery of ashes, garbage" &c., and that the same is true of the other owners. The answer admits such use from and after 1881.

The defendant, who is a lawyer, supervised the taking of title by his immediate grantor, Berges, from Applegate, in December, 1883, and while in his affidavit annexed to his answer he denied that either he or Berges had notice at that time of the verbal arrangement between the Misses Lee and Applegate with regard to the use of the alley in question, he does not deny that both himself and Berges then had actual knowledge of the existence of the passageway under the house and its use by the adjoining owners, and also of the peculiar clause in the deed from the Misses Lee to Lippincott of the complainant's lot.

*Mr. Clarence L. Cole*, for the complainant.

*Mr. August Stephany* and *Mr. William E. Potter*, for the defendant.

PITNEY, V. C.

The agreed statement of facts does not state, in so many words, that the conveyances to Mr. Caemmerer and to Mr. Lippincott of their lots respectively were made upon the representation and understanding that they were to have the benefit of a passageway along the rear of the several lots to Mansion House alley. But I think that such is the fair inference from the facts, and the cause was argued upon that basis. Besides, it sufficiently appears from the affidavits. So with regard to the time when complainant's house was built and occupied. That date sufficiently appears from the allegation and admission in the answer as to the date when the use for the removal of ashes, garbage &c. commenced, since such use clearly indicates the existence of a dwelling.

I find it quite impossible to avoid the conclusion that the

object of the language contained in the conveyance to Lippincott was to give to each of the five lots remaining after the sale of the westernmost to Kelly a right of way in succession, commencing with the Caemmerer lot, over the rear of each of the other lots, to Mansion House alley.  That was in exact accordance with the plan adopted by the Misses Lee in putting these lots on the market, and when all the facts were presented to me on the argument of a motion to dissolve the injunction, I conceived the notion that it was possible that those words might be properly construed, when applied to the facts, as a grant to Lippincott of a right of way over the rear of the lots lying to the east of his lot to Mansion House alley, and also as reserving a right of way over his lot in favor of Caemmerer's lot and the other lot between Caemmerer and Lippincott over Lippincott's and the two lots to the east of it, for it is quite difficult to suppose that the parties could have intended to give to the two lots to the east of Lippincott's a right of way over the rear of his lot to the Caemmerer lot, which was situate to the west of it.  Those lots to the east of Lippincott's could have no possible use of a right of way across the rear of it.  So strong was this notion that I advised that the injunction be dissolved upon terms that Mrs. Haslett should have the privilege of setting up a special plea to the action of trespass which had been enjoined, so that the question of the construction of that clause could be submitted to the proper court.  That course was taken, and a plea was filed and stricken out, on motion, upon the merits, to wit, as I understand the opinion, that the clause could not be so construed.  By that decision I am bound.

Upon that result Mrs. Haslett, in order to succeed, must establish a right to reform the deed to Lippincott in that respect, so as to make it correspond with the clear intention of the parties.

That the language is a palpable blunder is too clear for argument; and, as before observed, the real object must have been to give the lots to the west a right of way over the lots to the east to the Mansion House alley.  There is no dispute as to that object, as between the Misses Lee and Lippincott; so that it

seems to me quite clear that as between the complainant, who succeeds to Lippincott's rights, and the Misses Lee, complainant is entitled to have the deed reformed accordingly; or, in other words, she is entitled in equity to have the same benefit of it as if it had expressed the exact intention of the parties. Further, I think that the burden of this right was cast upon Mr. Applegate by the actual notice which he received of it when he purchased from the Misses Lee, contained in the verbal agreement between them. In other words, Applegate undoubtedly had actual notice of the plan which the Misses Lee had adopted of establishing and maintaining this alleyway for the benefit of the other lots, and he had constructive notice of the attempt to give it in writing, contained in the deed to Lippincott. So that I think the equity might have been enforced against Mr. Applegate.

This, it is to be observed, is not a question of creating an easement by parol, nor yet of a parol license given for a valuable consideration, which has been executed. There is, indeed, a full and valuable consideration, viz., the payment by Lippincott to the Misses Lee of the purchase price for his lot. Here, again, the stated case does not mention any consideration, yet that there was a valuable consideration was a conceded fact, and the omission to state it was an oversight of mine in dictating the agreed facts. It is, however, fairly inferable from the other facts.

The serious question in the cause is whether or not Mr. Stephany is chargeable with notice of this equity.

Let us see of what, precisely, he had notice. He had constructive notice of the several conveyances made by the Misses Lee prior to that to Applegate, his grantor. These were, first, that to Kelly of the lot next to North Carolina avenue. Next to that conveyance is the one to Caemmerer of a lot adjoining Kelly's on the east. Next is that to Lippincott of the complainant's lot (and of this the fair inference is that he had actual notice), containing the peculiar reservation above stated, viz.:

"Excepting and reserving, nevertheless, a strip of land on the rear or back of the said lot three feet wide for the use and accommodation of the owners or occupants of the two lots adjoining on the east and the two lots adjoining on the west of the lots herein conveyed."

A strict construction of this language would indicate that the lot complainant set about to purchase from Applegate had ·a right of way across the· Lippincott-Haslett lot, and in order to exercise that right, it must also have a right of way across the Harkins lot, and if defendant examined the deed to Harkins, made after that to Applegate, he found that such right was reserved. Now, it seems to me that it must have struck complainant that there was some mistake in the language used, and that it was not the intention to give the Applegate lot a right of way in the rear of complainant's lot, but that the intention was precisely the converse.   Next, he had actual notice, *in pais*, that Mr. Applegate, when he built on his lot, had, as shown by the plan accompanying the state of the case, covered the whole· lot, with his building, but had left a covered alleyway in the rear three feet wide and up to the height of the top of the first story, and he had notice that it opened to the adjoining lots, and was in actual use by their occupants.

Now, it seems to me that it was impossible to escape the inference that such ·a peculiar and unusual arrangement of a building must have been made for the purpose of leaving a passageway for the benefit of the adjoining property.   The location and situation show this.   Such a passageway could, so far as appears, be of no use to the Applegate lot, which, as we have seen, abutted on the Mansion House alley, and was entirely covered by the building.

Then defendant had further notice that the occupants of the lots to the west had been in the habit for several years—the bill alleges since 1880, and the answer admits since 1881—of using this covered passageway to remove the ashes, garbage, kitchen and house waste from their dwellings.   For this purpose its use was of great consequence to them.   The plot shows that the buildings on these lots cover the whole front, leaving no passageway from the street to the rear for such purpose, and without the outlet here in question they will be compelled to carry out this refuse material through their dwellings to the street in front. .

That the situation of the premises conveyed and objects thereon

may be sufficient to put a party on inquiry is sustained and illus-
trated by the adjudged cases. In *Hervey* v. *Smith, 1 K. & J.
389* (on application for injunction), and *22 Beav. 259* (on final
hearing), the facts were that A, the owner of a building, sold to
B, the owner of the adjoining premises, the right of using two
chimneys in A's wall. The consideration was paid, and the
chimneys were used for eleven years, but no grant was executed;
C purchased A's house without notice of the right; but there
being fourteen chimney-pots on the wall and only twelve flues
in A's house, held that C was put on inquiry of the right, and
was bound by it, and an injunction was granted to restrain him
from stopping up the two chimneys. It was held, also, that it
was unnecessary that the bill should pray for a specific per-
formance and that the absence of a grant was immaterial.

In *Davies* v. *Sear, L. R. 7 Eq. Cas. 427 (1869)*, the defend-
ant purchased a house with an archway under it, wide enough
for the use of horses and wagons, leading to a yard in the rear
in which certain stables were being erected. It was held that
the condition of the premises when he purchased them was notice
to him that they were prepared for the purpose of giving access
to stables. Lord Romilly, in his opinion (at *p. 432*), uses this
language: "In the first place, he saw distinctly the arch-
way; he bought the house subject to the archway; for what
purpose did he suppose that the archway was made unless as a
mode of access?   *   *   *   He could hardly believe that the
archway was meant as an ornament, without use to anyone.
The foot-pavement was interrupted, the curbstone rounded off
on each side and the entrance paved as is usual in entrances into
mews. The mews themselves were then in course of erection
and one side had been, if not completed, at least sufficiently
erected to show the scope and plan of the building." Further
on he says: "A man cannot take the assignment of the lease of
a house having an archway and road under it leading to a mews,
and abstain from looking at the plan by which the adjoining
ground is laid out and intended to be built upon; he cannot
stand quiet and see it gradually become covered with houses so
that every access or means of communication with the mews is

shut out except this one, which he had always known was intended to be used as a means of access, and then say 'this easement was not reserved, although there was an archway and road under the house.' It does not lie in his mouth to say, 'I did not understand that you intended to close all other means of access and leave this as the only existing one.' "

In the case of *Raritan Water Co.* v. *Veghte, 6 C. E. Gr. 463* (at *pp. 478, 479*), the condition of the premises when the complainants purchased, and the actual diversion of the water, was held to put the complainants upon inquiry.

For these reasons I think that the facts above stated, which were clearly within the defendant's knowledge, were sufficient to put him upon inquiry. The general doctrine that facts which are sufficient to put a party upon inquiry are sufficient to charge him with all such knowledge as he would have acquired by a proper inquiry in the ordinary course of business, is, as I take it, thoroughly established in this state. It was so held in the court of appeals in the case just cited, and that case followed *Hoy* v. *Bramhall, 4 C. E. Gr. 563*, in the same court. The doctrine of those cases has always been followed in New Jersey, and I do not understand that there was any intention to overrule them in the case of *Lawrence* v. *Springer, 4 Dick. Ch. Rep. 289*. That was a case of an allegation that a certain party acted upon the strength of the silence of another who had notice of what he was doing. It was held that the facts were not sufficient to charge the party with notice; and further, that there was no contract, verbal or otherwise, and no consideration paid for the right which was set up.

Now, coming to the conclusion that the defendant had knowledge of facts which made it his duty to inquire as to the rights of these persons, including the complainant, who were using this passageway in the way described, the next question is, What information would he, in the due course of business, have acquired if he had made proper inquiry? His first duty was to inquire of those who were using the passageway, to learn from them what their claim was. And, in the second place, to inquire of his own immediate grantor, and, in succession, of his grantor,

as to what right the claimants had. Now it seems to me that if he had made that inquiry, it must be presumed that he would have ascertained the truth, which was that Mr. Applegate had bought his premises on the understanding that the owners to the west of it were to have a right of passageway three feet wide, and that he built the passageway in question in express acknowledgment of that right. He would further have learned, as I infer from the admitted facts, that the complainant and other persons in like situation had constructed their houses upon the strength of their supposed right of passage over the rear of the defendant's lot.

For these reasons, and upon the whole case, I think the complainant is entitled to relief. She not only prays that the suit at law may be enjoined, but that the defendant may be enjoined from obstructing the alleyway or depriving her of the full and complete use and enjoyment of the same as hitherto, and for further relief. I think that a reformation of the deed is fairly within the prayer for other relief. But she is clearly entitled to the injunction against interfering with the right of way, and I am not sure that an actual reformation here is necessary. It was held to be unnecessary in *Hervey* v. *Smith, supra.*

I will advise a decree accordingly.